Filed 10/7/22 P. v. Viruncruz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HILARIO VIRUNCRUZ,<br><br>    Defendant and Appellant. | F081294<br><br>(Super. Ct. No. BF173639A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Michael E. Dellostritto, Judge.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Walking home from a friend's house, 13–year–old S.M. came upon appellant Hilario Viruncruz working on his truck by the side of the road. Viruncruz asked S.M. if he would help do some work for him. S.M. said he would but needed to ask his mother

first. Viruncruz offered him a ride home. During the drive, Viruncruz casually touched S.M. on the shoulder, neck, and abdomen. But instead of driving S.M. home, Viruncruz drove him to an unfamiliar neighborhood, forced his hand down S.M.'s pants, and touched his genitals. Although Viruncruz tried to hold him down, S.M. was able to break free, open the truck's door, and flee.

A jury convicted Viruncruz of kidnapping with the intent to commit a lewd and lascivious act on a person under the age of 14 (Pen. Code, §§ 209, subd. (b)(1) & 288) and committing a forcible lewd and lascivious act on a person under the age of 14 (Pen. Code, § 288, subd. (b)(1)). As to the forcible child molest charge, the jury further found two enhancing allegations true: In the course of the molest, Viruncruz kidnapped S.M. (Pen. Code, § 667.61, subd. (e)(1)), and in doing so he substantially increased the risk of harm to S.M. (Pen. Code, § 667.61, subd. (d)(2)).

The statutorily mandated sentence on the child molest charge with both enhancing allegations is life without the possibility of parole. (Pen. Code, § 667.61, subd. (j)(1).) Finding such a sentence unconstitutionally cruel and unusual, the trial court struck the first enhancement, imposed the second, and sentenced Viruncruz to an indeterminate term of 25 years to life with the possibility of parole. (Pen. Code, § 667.61, subd. (j)(2).) For the kidnapping conviction, the court imposed a life with the possibility of parole sentence but stayed it under Penal Code section 654.

Viruncruz contends: (1) Insufficient evidence supports his convictions. (2) The trial court prejudicially erred by admitting evidence of child pornography-related internet searches and website links found by police on his cellphone. (3) The prosecutor committed prejudicial misconduct by cross-examining him about his attempts to obtain legal counsel before he was arrested. (4a) The prosecutor also committed prejudicial misconduct during her closing arguments, and (4b) even if the claim was forfeited, trial counsel was constitutionally ineffective for failing to object. (5) The trial court prejudicially erred by failing to give sufficient jury instructions on aggravated

2.

kidnapping's lesser included offenses. (6) Even if individually harmless, the cumulative effect of the trial errors together constitutes reversible error. (7) Finally, in supplemental briefing, he claims his sentence must be reversed and remanded for resentencing in light of amendments made to section 1385 while this appeal was pending and which became effective on January 1, 2022.

We reject Viruncruz's evidentiary claims, and his claim the prosecutor's cross-examination was improper. We also find there was no instructional error.

We find the prosecutor may have made marginally improper arguments in her closing arguments, but because they were not objected to, we do not decide the issue since the claim was forfeited. Similarly, we reject Viruncruz's ineffective assistance of counsel contention because he has not demonstrated his trial counsel was constitutionally ineffective for failing to object to the prosecutor's remarks. And, with a single forfeited error, there are no errors to cumulate and that claim fails as well.

As for Viruncruz's resentencing contention, we find he is not eligible for resentencing under amended Penal Code section 1385 because it does not apply to the enhancements imposed in this case.

The judgment is therefore affirmed.

## FACTS

Because Viruncruz raises a sufficiency of the evidence claim, we lay out the underlying facts in some detail, doing so as we must in the light most favorable to the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the other issues Viruncruz raises are set forth below.

Thirteen-year-old S.M. was walking home from a friend's house one morning in September 2018 and saw Viruncruz working on his truck by the side of the road. Viruncruz asked S.M. to help him with the truck and if he wanted to do some yard work for him. S.M. said he would have to ask his mother. Viruncruz said there was no time

3.

for that because he was late, but S.M. insisted he needed to ask his mother. Viruncruz then offered to take S.M. to his mother, and S.M. agreed.

S.M. told Viruncruz where his house was, but Viruncruz drove past it. S.M. said at that point his "heart started to beat." S.M. asked Viruncruz where they were going, and he replied, "The next street." But they passed the next street without stopping. S.M. told Viruncruz, "my house is not this way," to which he replied, "I know." S.M. thought the truck's doors were locked because the passenger lock knob was "down," although he did not try to unlock his door at this point.

Viruncruz asked S.M. for his shirt size so he could get him a work shirt. S.M. said he was a medium, but Viruncruz said he wanted to check and pulled S.M.'s collar back. Viruncruz said he wanted to be a chiropractor and asked S.M. if he could massage his shoulders. He also patted S.M.'s abdomen, saying that S.M. was "getting too fat." Viruncruz massaged S.M.'s shoulders both over and under his shirt. Viruncruz then gave S.M. $20. S.M. tried to give it back, but Viruncruz refused.

After they had been driving around for about 30 minutes, Viruncruz parked in an area unfamiliar to S.M. He asked Viruncruz where the job was, and Viruncruz replied that he could not find it and would have to call his brother. Viruncruz cleared everything off the middle of the seat and tried to get S.M. to lie down. He then grabbed S.M.'s shoulders and tried to pull him down on the seat. S.M. said "No," while Viruncruz said, "Come on, come on."

S.M. tried to move Viruncruz's hands away, but Viruncruz placed them on S.M.'s abdomen and tried to put them down his pants. Viruncruz was able to get his hand under S.M.'s underwear where he then touched S.M.'s genitalia with the palm of his hand. S.M. told him to stop but Viruncruz looked at him, smiling, and said, "Come on, I'll give you more money."

4.

S.M. moved his body and was able to pull Viruncruz's hand out of his pants. He tightened his belt to prevent Viruncruz from doing it again, but Viruncruz tried to grab his arm to keep him in the truck and said, "You're not going."

S.M. tried to unlock the passenger side door, both when they were moving and when they had finally stopped. But each time he pulled up on the lock knob it went down again. S.M. finally held the lock knob in the up position and was able to open the door with his other hand. S.M. broke free, got out, and ran to a nearby house. He said that as he ran, he thought he was going to die.

S.C. was in her living room when her husband answered the door. A very upset S.M., looking backward over his shoulder, asked them for help.[1] He said someone had abducted him and put his hands down his pants. S.C. called 911 while her husband and 21-year-old son ran outside looking for the assailant.

Kern County Sheriff's Detective Ryan Sorrow arrived and interviewed S.M. who described Viruncruz and the truck. Surveillance footage was obtained from two nearby homes which showed a truck matching S.M.'s description in the area at the time of the incident.

Two days later, Sheriff's Deputy Ryan Pollack received a call about a truck matching the description of the truck in the footage. Responding to the location, he compared the truck to a still image taken from the footage and concluded it was the same vehicle. Pollack watched Viruncruz removing a trash can from the truck's trailer. He approached and showed Viruncruz the still photo and Viruncruz admitted the picture was of his truck.

---

[1] S.C. said she later viewed footage from her home-surveillance camera that showed S.M. running from the street, across the sidewalk and yard, and up to her front door, knocking, "looking nervous and looking back and asking for help before we opened the door."

Pollack notified Sorrow he had a suspect. Sorrow brought S.M. to the scene, and S.M. identified the truck and Viruncruz as the man who had sexually assaulted him. S.M. also recognized a cooler inside the truck, and how the steering wheel cover and the truck's seat were "all messed up." S.M. told Sorrow the air conditioner in Viruncruz's truck had a distinctive odor, which he described as being like the gas used at dentists' offices when they are extracting teeth and "put that facemask on you." S.M. said the odor had made him lightheaded and said he started to open and close his eyes. He recognized the same odor inside the truck on the day he identified it for Sorrow.

About 12,000 pages of data were forensically extracted from Viruncruz's cell phone. The evidence technician who extracted it said the data was linked to an iCloud account "hvirun@gmail.com."

Sheriff's Detective Paul Sanchez examined the data extraction report and said there were several photographs of Viruncruz and his family, and messages sent by a person identifying himself as "Hilario" requesting information because he had obtained a new phone. There were web searches for the name "Hilario Virun," and emails from a "Hilario" indicating he was with "HVC Landscaping." The data ranged from August 2016 to August 2018.

Sorrow interviewed Viruncruz after his arrest. Viruncruz told him he had two last names, "Virun" and "Cruz," but went by "Virun" most of the time. Viruncruz said the name of his business was HVC Landscaping, and "HVC" referred to his initials.

Sanchez also found evidence of numerous sexually based web searches, primarily for male children between the ages of 11 and 13. He said the data showed 14,018 web searches related to such male children, and the web history results showed about 3,808 specific web sites which involved sexual content related to young males. Search terms included "ninos violados" and "peliculas de robo de ninos," which Sanchez explained

6.

meant "boys violated," and "movies of kidnapped boys." These data ranged between October 2016 and July 2017.[2]

The extraction report also showed several web searches were made during the time Viruncruz was detained in the back of Pollack's patrol car. At 11:38 a.m. a search was entered for, "Steps to take if you are accused of child molestation." At 12:26 p.m., "Do child molesters last long in jail." And at 12:27 p.m., "Penal Code Section 288." Pollack testified he never told Viruncruz what was being investigated or why he was being detained, either before or after placing him in the patrol car.

In the defense case, Viruncruz called S.M.'s parents as witnesses. Both were unemployed at the time and said they were having financial issues. They testified it was not unusual for S.M. to look for work. Father testified he normally came home to ask permission to take a job. Mother testified he did not normally ask permission, but said he usually worked only for neighbors and friends. Both said any money S.M. earned was for himself, not to help support the family.

Both parents also testified S.M.'s behavior changed dramatically after the incident, with mother explaining S.M. would no longer leave the house, and Father referring to a family trip to Magic Mountain by saying S.M. would not leave his side. When asked if S.M. was a "fairly friendly" young man, Father replied, "He used to be." Mother testified about their attempts to get S.M. into counseling but only recently succeeding because of insurance problems.

Viruncruz testified on his own behalf. He said that on the date in question (a Saturday), he dropped his lawnmowers off at a lawnmower repair place. After unloading the lawnmowers, his hands were stained green, and he did not clean them. As he was driving away, someone honked at him and gestured there was something wrong with his

---

[2] The record contains many more extremely explicit search terms that we need not list here; their import is clear and Viruncruz does not question their meaning.

7.

lights. He pulled over onto a side street and found one of his trailer's signal lights was not working. He checked under the hood and then under the body of the truck to try to find the problem.

While Viruncruz was under the driver's side of the truck, he saw a young man standing next to the truck. The young man asked if he needed any help with his work. Viruncruz told him it was his day off. The young man said he needed work because his father was disabled, his mother was the only person working, and the family was going to have to move to a different state.

After Viruncruz finished checking his truck, the young man asked him for a ride to his aunt's house. Feeling sorry for the young man, Viruncruz agreed. The young man told him which direction to drive but did not say exactly where his aunt lived. Eventually, the young man directed Viruncruz to a residential area and asked him to stop.

Viruncruz said the young man took his seatbelt off and asked for $20. He took out his wallet, which had a little more than $900 in it, and pulled out a $20 bill. The young man took the bill and then reached out to grab his wallet. He placed his wallet between his legs and asked the young man why he wanted to steal from him. The young man just laughed.

Viruncruz said he grabbed the young man's hand to try to get his $20 bill back but decided to let go so as not to hurt him. The young man then hit Viruncruz with his elbow, opened the door, and left. He said he did not report the incident to police because the young man only took $20 from him, and he thought he needed the money. He returned home and went with his wife to Salinas for a birthday party.

On the following Monday, Viruncruz came back to work and saw pictures of what looked like his truck on social media in relation to a kidnapping investigation. He was not sure the truck he saw on social media was his until the deputy stopped him. While detained in the back of the patrol car, he saw the young man who he said had tried to steal his wallet get out of one of the other patrol cars and go over to his truck to identify it.

8.

While he was in the back of the patrol car, he used his cell phone to tell his wife that he had been arrested. He said he then used his phone to search for an attorney.

On cross-examination, the prosecutor inquired about the other back seat web searches and when Viruncruz was confronted by the wording of some of them, he responded, "I can't give you an explanation, because — I can't give you an explanation for that, because that's something I can't tell you, because I don't remember having co[nn]ected on that." He also insisted he did not give rides or money to children, and this was the first time he had ever offered a ride to a child and the first time he had ever given a child money. He acknowledged being interviewed by Sorrow about what he did on the date in question and not telling Sorrow about his encounter with S.M. He explained he did not say anything about that because Sorrow "already knew why I had been arrested." As for the thousands of web searches for sexual content regarding minors, Viruncruz insisted "the searches I can't say belong to me."

The defense introduced evidence from the clothing S.M. wore on the day of the incident. A DNA swab taken from S.M.'s belt buckle showed a mixture from at least two contributors, but Viruncruz was excluded as a potential contributor. Another swab from the inside of S.M.'s pants showed a single contributor, but Viruncruz was again excluded. Finally, a profile from a swab taken inside S.M.'s underwear showed a DNA mixture, but it was inconclusive as to Viruncruz's DNA, and S.M. could not be excluded as a contributor.

Viruncruz's brother testified he sold the truck to Viruncruz in 2015 and had not ridden in it since. He said the windows, doors, and seats were all manually controlled, not electronic, and at the time he sold it, the driver would need to reach across in order to lock or unlock the passenger side door.

The prosecutor recalled Sorrow, who testified in more detail about his interview with Viruncruz. When Viruncruz first described the events of the day of the incident, he said he had dropped his lawnmowers off for repairs and had gone to Salinas for a

birthday party, but did not mention anything about his interactions with S.M. When Sorrow asked Viruncruz if he knew why he was being questioned, Viruncruz said they were accusing him of being a child molester. It was only when Sorrow inquired as to what he meant by that, that Viruncruz finally related his version of the events involving S.M.

## DISCUSSION

### I. Sufficiency of the Evidence

Viruncruz first contends the jury's verdicts are not supported by substantial evidence. We conclude otherwise.

#### A. Legal Background and Standard of Review

"In reviewing a sufficiency of the evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) "[W]e review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) " '[W]e review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime… beyond a reasonable doubt.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, original italics.) " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Ibid.*)

" 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a

10.

witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

Thus, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Simply put, Viruncruz "bears an enormous burden" to prevail on a sufficiency of the evidence claim. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

### B. Analysis

Viruncruz does not contend S.M.'s testimony, if believed, did not establish the elements of the offenses with which he was charged. Instead, he argues we should "consider the lack of physical evidence" against him as well as "the inconsistent, untruthful claims put forth by the alleged victim," as failing to establish sufficiently reliable support for the jury's verdicts. In other words, he claims S.M. was not credible and there was insufficient corroborative physical evidence.[3]

As for his lack of "physical" evidence claim, Viruncruz first points to the fact Viruncruz's DNA was not found on S.M.'s clothing. He provides no authority for a claim a defendant's DNA must be detected to justify a conviction.

Moreover, the DNA expert testified that, unlike biological fluids, "touch" DNA is normally in a much smaller amount, and she could not say "one way or the other" whether it was possible Viruncruz's DNA "was in the victim's underwear." Similarly, the fact that Viruncruz's DNA was not found on S.M.'s belt buckle or zipper is not significant because S.M. did not say Viruncruz touched his belt or his zipper. Absence of evidence is not evidence of absence.

---

[3] In making this latter claim, Viruncruz does not mention the "physical evidence" that *was* present, i.e., the thousands of web searches found on his phone as well as the searches he made while in the back of Pollack's patrol car.

Viruncruz next points to the fact that "no grease, oil, or any other substance was found" on S.M.'s clothing. He concludes from this that S.M. must have lied in his testimony when he supposedly said Viruncruz "had previously been working on his truck and had oil-covered hands, and . . . the man was not wearing gloves." Furthermore, because Viruncruz testified the only things on his hands were green grass stains from his lawn mowers, "[t]he lack of any grease, oil or 'green' " on S.M.'s clothing "further demonstrates the insufficiency of the physical evidence against [a]ppellant."

First, this misstates S.M.'s testimony, and the record reference Viruncruz provides does not support his claim. S.M. did not refer to Viruncruz's hands during his direct examination. He testified Viruncruz was "working on his truck," which had its "hood open." Later, on cross-examination, S.M. said: "[H]e was under the hood because he was going to have me hold something while he did something too. It was like a fuel line or oil or something like that. He had me hold a line from where the truck is because he said it was leaking gas." However, S.M. did not smell gasoline or see any on the ground.

On further cross-examination, defense counsel posed a compound question, "You said there was oil and dirt and he wanted you to hold something," to which S.M. answered "Yeah." Counsel then asked about Viruncruz placing his hands inside S.M.'s shirt, and counsel said, "[H]e was doing that with those same oily, dirty hands that he was under the truck working with, right?" S.M. answered, "Yes," but the prosecutor objected on the grounds that it misstated S.M.'s earlier testimony. It did. S.M. never mentioned Viruncruz's hands and instead said Viruncruz was working under the hood, not under the truck, when S.M. had assisted him. The trial court asked defense counsel to clarify, and counsel asked whether Viruncruz "was working with oily parts on the top of the truck," to which S.M. replied, "Yes." Thus, S.M.'s testimony is at most ambivalent, but is not inconsistent or demonstrably untruthful.

Similarly, Viruncruz also mischaracterizes S.M.'s testimony regarding the passenger side door lock. S.M. did not testify the door locks were "automatic"; he simply

12.

said that when he tried to lift the lock button, it would go back down, and he was unable to get the door open until he held the lock button up with one hand and opened the door with the other. Viruncruz's brother testified the truck did not have automatic door locks, but there was no further evidence regarding the passenger side lock or the function of the locking/unlocking button in 2018. Again, S.M. was neither inconsistent nor demonstrably untruthful.

Viruncruz concludes his argument by observing that, "[u]ltimately, the entire case hinged on [S.M.]'s word against [a]ppellant's," and that based on the evidence, we as a reviewing court "should be left with a firm conviction that [a]ppellant should never have been convicted." We agree the case was a credibility contest, as many are, but not that we must have a "firm conviction that [Viruncruz] should never have been convicted."

Such a claim misconstrues both the relevant standard of review and our fundamental role as an appellate court because it essentially asks us to reweigh the evidence. Our review is limited to "whether substantial evidence supports the [jury's] decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [the relevant "inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt' "].)

Moreover, a conviction may be sustained on the uncorroborated testimony of a single witness unless it is physically impossible or inherently improbable. (Evid. Code,[4] § 411; *People v. Scott* (1978) 21 Cal.3d 284, 296; see *People v. Harlan* (1990) 222 Cal.App.3d 439, 454 [no corroboration required for testimony of child victim of sexual abuse]; cf. *People v. Gammage* (1992) 2 Cal.4th 693, 702 ["Although no corroboration is required in most prosecutions, . . . trials of sex crimes, which often are a credibility contest between the accused and the accuser, have 'special features which

---

[4] Undesignated statutory references are to the Evidence Code.

make [a jury instruction] on lack of corroboration most proper.' "].) Viruncruz has not shown that S.M.'s account was either impossible or inherently improbable.

Lastly, credibility questions are not for a reviewing court to resolve; they are for the jury. The fact Viruncruz testified differently or that he now perceives issues with S.M.'s credibility does not affect our conclusion because the jury, not the reviewing court, assesses the credibility of the witnesses and makes the ultimate determination of whom to believe. (*People v. Dowl* (2013) 57 Cal.4th 1079, 1092 ["To be sure, defendant offered explanations for some of [the] circumstances, but the jurors did not have to believe them."]) We are not free to reform a jury's verdicts simply because the testimony could support a contrary finding. (*People v. Jackson* (2016) 1 Cal.5th 269, 345.) "Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.) To the contrary, the verdicts in this case are supported by substantial evidence.[5]

## II.     "Character" Evidence:

Viruncruz next claims the trial court prejudicially erred by admitting evidence of the sexually related web searches and links found on his phone, contending they constituted inadmissible character evidence in violation of sections 1101, subdivision (a) (hereafter section 1101(a)), and 352. We find no error.

---

[5] Viruncruz tries to cast his insufficiency of the evidence claim in constitutional terms, contending he was denied his "Fifth, Sixth and Fourteenth Amendment Rights." However, "[n]o separate constitutional discussion is required … when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time [on appeal]." (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29; see also *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

## A. Additional Background

Viruncruz filed a pretrial motion to "prohibit references to alleged pornographic material and internet searches." (Capitalization omitted.) He argued such evidence was impermissible character evidence proscribed by section 1101(a).

The prosecutor did not file a written response, but she argued the web searches and copies of four pornographic photos found at web-linked sites on Viruncruz's phone were relevant to show Viruncruz's intent in touching S.M., apparently referring to section 1101, subdivision (b) (hereafter section 1101(b)).

She also argued the evidence was admissible under section 1108 as "other act evidence," constituting "separate and distinct criminal act[s] that [were] uncharged and [they] show[] the defendant's again [*sic*] sexual intent and sexual nature towards males of this particular age."

Defense counsel responded that the evidence of searches from 2016 through 2017 was temporally too remote to be relevant to a 2018 charged offense. Further, he argued the evidence would result in a "fundamentally unfair trial," and that under section 352, "[t]he probative value is highly overweighed by the prejudicial value." He did not distinguish between sections 1101(b) and 1108 and instead insisted "this is purely [section] 352."

The trial court decided an evidentiary hearing was needed before it could make the necessary determinations. At that hearing, Detective Sanchez testified. He said he had analyzed cell phone extraction reports approximately 50 to 60 times by the time of the hearing and had analyzed about five such reports prior to reviewing the extraction report in Viruncruz's case. He reviewed the extraction report from Viruncruz's cell phone and found that from 2016 to 2017 the phone had been used to make numerous searches for sexually explicit material regarding underage boys. Sanchez linked to the URLs[6] of

---

[6] A "URL," or "uniform resource locater," is a unique identifier used to locate a resource on the Internet. It is also sometimes simply referred to as a web address. (See

15.

some of the websites listed in the extraction report and found that they contained images of young boys either nude or in underwear, including some that depicted explicit child pornography. Sanchez identified four images of child pornography that he found by following links found in the cell phone's history. He accessed these images in 2018 but could not say whether the URLs linked to the same images when they were accessed in 2016 and 2017.

Sanchez also identified several items in the extraction report that linked Viruncruz to his phone in 2016 and 2017, including Google searches for the name Hilario, photographs of Viruncruz and his family, and text messages that appeared to be from Viruncruz. In addition, Sanchez identified the 2018 searches about child molestation law and consequences made the day and time Viruncruz was detained in Pollack's patrol car.

The trial court ruled there was sufficient circumstantial evidence connecting Viruncruz to the phone in 2016 and 2017 to render the web search evidence relevant. The court also ruled that while there were limits to what Sanchez could testify to in front of the jury, he was sufficiently qualified to testify about the significance of items he found in the extraction report.

The court further ruled the prosecutor was not permitted to introduce the four photos Sanchez found when he linked to the 2016 and 2017 sites because they were too prejudicial. However, Sanchez could testify as to what he saw when he visited those sites in 2018.

The court also emphasized that the 2016-2017 searches and results were not to be characterized as "child pornography." Instead, they were to be described as "inappropriate sexual contact between juveniles and male adults," because referring to them as child pornography would be unduly prejudicial.

---

"URL," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/URL.)

## B. Legal Background

" ' "In reviewing the ruling of the trial court, we reiterate the well-established principle that 'the admissibility of [] evidence has two components: (1) whether the challenged evidence satisfied the "relevancy" requirement set forth in [section 210], and (2) if the evidence was relevant, whether the trial court abused its discretion under [section 352] in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' " ' "[7] (*People v. Parker* (2022) 13 Cal.5th 1, 38 (*Parker*).)

In California, "*[e]xcept as otherwise provided by statute*, all relevant evidence is admissible." (§ 351, italics added.) Section 1101(a) provides: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Thus, "[a]s a general rule, 'propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' " (*People v. Dworak* (2021) 11 Cal.5th 881, 899 (*Dworak*).)

However, section 1108, subdivision (a) "provides an exception to this rule: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [section 1101(a)], if the evidence is not inadmissible pursuant to [section 352].' " (*Dworak, supra,* 11 Cal.5th at p. 899.) For purposes of section 1108, "sexual offense" is defined by a list of qualifying offenses, one of which is possession of child pornography. (§ 1108, subd. (d)(1)(A); see Pen. Code, § 311.2.)

---

[7] In full, section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Moreover, "evidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282–283 (*Branch*).) "Indeed, the reason for excluding evidence of prior sexual offenses in such cases is not because that evidence lacks probative value; rather, it is because ' "it has too much." ' " (*Id.* at p. 283.; see *People v. Yovanov* (1999) 69 Cal.App.4th 392, 405 ["evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presump[tively] admissible"].) " 'In short, if evidence satisfies [section 1108], and is not excluded under [section 352], admission of that evidence to prove propensity is permitted.' " (*Dworak, supra*, 11 Cal.5th at p. 899.) We review a trial court's ruling under section 1108 for abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

As for section 1101(b), even though "evidence of a character trait is not admissible [under section 1101(a)] to demonstrate conduct on a particular occasion, [] such evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, ...) other than his or her disposition to commit such an act.' " (*Parker, supra,* 13 Cal.5th at pp. 38–39, quoting § 1101(b).)

Therefore, evidence of other acts can provide circumstantial evidence from which intent may be inferred and, "[a]s with other types of circumstantial evidence, its admissibility depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (*People v. Thompson* (1980) 27 Cal.3d 303, 315 (*Thompson*).) Viruncruz's lewd intent was a material fact in both charged offenses and had to be proved by the prosecution. And because a " 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense,' " the other conduct had a tendency to prove

Viruncruz's intent.[8] (*Branch, supra,* 91 Cal.App.4th at pp. 282–283.) Aside from his section 352 arguments, Viruncruz does not posit any other rule or policy requiring the exclusion of circumstantial evidence of intent.

As with section 1108, " '[w]e review the trial court's rulings on relevance and the admission of evidence under [sections 352 and 1101] for abuse of discretion.' " (*Parker, supra,* 13 Cal.5th at p. 39.) Such review "is highly deferential, and we 'will not reverse a court's ruling on such matters unless it is shown ' " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*)

## C. Analysis

### i. Section 1108

As noted *ante*, possession of child pornography is a "sexual offense" within the meaning of section 1108 because it is "a crime under the law . . . that involve[s] . . . conduct proscribed by . . . subdivision (b), (c), or (d) of [Penal Code] [s]ection 311.2 …." (§ 1108, subd. (d)(1)(A).) In turn, subdivisions (b), (c), and (d) of Penal Code section 311.2 proscribe various types of knowing possession and use of "matter depict[ing] a person under the age of 18 years personally engaging in or personally simulating sexual conduct …." Sanchez testified at the evidentiary hearing that the "matter" he found when he linked to at least four of the website addresses contained in Viruncruz's phone was child pornography, and the scores of other sexually explicit web search terms similarly demonstrated what was being searched for.

Notably, an *attempt* to possess child pornography is also a qualifying sexual offense under section 1108. (See § 1108, subd. (d)(1)(F); *People v. Spicer* (2015) 235 Cal.App.4th 1359, 1384 [section 1108 authorizes admission of "attempted sex

---

[8] "When evidence tends to prove a material fact, it is said to be relevant evidence." (*Thompson, supra,* 27 Cal.3d at p. 316, fn. 15, citing § 210.)

crimes"].) Thus, even though there was no child pornography found on Viruncruz's phone when it was forensically examined in 2018, there was evidence of at least four 2016-2017 web searches on URLs that in 2018 directly linked to child pornography. Moreover, the web search history was littered with search terms unequivocally showing a sexual interest in underage boys. In other words, although Viruncruz may not have been in possession of child pornography when his phone was examined in 2018, he was in possession of circumstantial evidence showing he had at the very least *attempted* to obtain child pornography in 2016 through 2017. Section 1108 therefore applies.

Viruncruz argues the evidence was "irrelevant to any issues in this case and should not have been admissible at trial." To the contrary, as explained above, for purposes of section 1108, "evidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' " (*Branch, supra,* 91 Cal.App.4th at pp. 282–283.) Viruncruz also argues the prejudicial effect of the cellphone evidence outweighed its probative value because the cellphone evidence "offered no probative value." This is simply another way of stating it was irrelevant, which we have already determined not to be the case.

For section 1108 review, our Supreme Court has "instructed that the trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' " (*Dworak, supra,* 11 Cal.5th at p. 900.) Here, the record shows the trial court considered all these factors in making its rulings. Indeed, the court refused to allow the prosecutor to

20.

introduce the photos Sanchez found and prohibited any reference to "child pornography" to lessen any prejudicial effect.

The 2016-2017 web search evidence: (1) was not highly inflammatory in comparison to the more serious charged crimes; (2) was not likely to distract or confuse the jurors from their main inquiry or consume undue time because the evidence was admitted in the form of an exhibit and Sanchez's limited testimony; (3) did not impose an undue burden on defendant in defending against the uncharged conduct because the searches and URLs were physically on his phone and his only explanation was to deny they were his and knowing how they got there; and (4) at only two years old at most, the evidence was not so remote in time as to drastically reduce the likelihood of a propensity to commit the charged offenses. (Compare *People v. Cordova* (2015) 62 Cal.4th 104, 133 [offenses 13 and 18 years *later* than the charged crime; "the time gap alone does not compel exclusion of the evidence"].)

In reviewing a section 1108 ruling, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice. (*Dworak, supra*, 11 Cal.5th at p. 899,) Viruncruz has failed to show that the trial court here " ' " 'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Miles* (2020) 9 Cal.5th 513, 587-588.) The cell phone evidence was admissible under section 1108.

### ii. Section 1101(b)

As noted *ante*, another statutory exception to section 1101(a)'s prohibition is section 1101(b). Under that subdivision, evidence of other acts is admissible when relevant to prove some fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. (*Parker, supra,* 13 Cal.5th at pp. 38-39.)

21.

Although the prosecutor did not refer to section 1101(b) by name, she implied it was the grounds for admission because she insisted the cellphone evidence was relevant to show Viruncruz's intent in touching S.M. and to also establish one of the elements of the aggravated kidnapping charge.

Viruncruz fails to discuss section 1101(b) or why it would or would not apply in this instance. Instead, he tells us his case "closely resembles" *People of the Territory of Guam v. Shymanovitz* (9th Cir. 1998) 157 F.3d 1154 (*Shymanovitz*) and relies on that case as primary support for his claim.

Lower federal court decisions are not binding on California courts. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.) More importantly, Viruncruz does not mention that *Shymanovitz* was overruled by an en banc court in *United States v. Curtin* (9th Cir. 2007) 489 F.3d 935 (*Curtin I*) on the very same issue Viruncruz now cites it for. And "on this issue, *Shymanovitz* is no longer valid precedent." (*United States v. Curtin* (9th Cir. 2009) 588 F.3d 993, 996-997 (*Curtin II*).) We are not obliged to follow lower court federal opinions, and even less so with overruled ones.[9]

*People v. Memro* (1995) 11 Cal.4th 786 (*Memro*) is more instructive here. In *Memro*, the prosecutor introduced evidence from magazines and still photographs which depicted stories, images, and drawings of male children ranging in age from pre-pubescent to young adults. (*Id.* at p. 864.) Some were sexually explicit, and some were not. (*Id.* at pp. 864–865.) Our Supreme Court concluded the material was admissible under section 1101(b) because it "yielded evidence from which the jury could infer that

---

[9] The case is also factually distinguishable. In *Shymanovitz,* the defendant was a school guidance counselor who took middle-school students on camping trips and sexually abused 11 boys. (*Shymanovitz, supra*, 157 F.3d at p. 1155.) The prosecution introduced evidence that he possessed sexually explicit gay pornography depicting *adult* males engaging in sexual conduct. (*Id.* at pp. 1158–1159.) The court found no relevant connection between adult and child pornography, and concluded the prosecution was merely pandering to homophobia. (*Id.* at p. 1158, 1161.)

22.

[the defendant] had a sexual attraction to young boys and intended to act on that attraction." (*Id*. at p. 865.) So too here. The only difference between *Memro* and the current case is the nature of the media involved.

Viruncruz placed his intent at issue by pleading not guilty to the crimes charged, so it was a material fact in dispute. (*People v. Balcom* (1994) 7 Cal.4th 414, 422-423.) Thus, the cellphone evidence was admissible to demonstrate Viruncruz's lewd intent, which was an element of both the aggravated kidnapping charge and the forcible lewd act charge. As in *Memro, supra*, the jury could properly infer from the web search evidence that Viruncruz was sexually attracted to boys of S.M.'s age and intended to act on that attraction.

Furthermore, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] … In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' " probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) Here, both types of misconduct show Viruncruz's sexual attraction to boys of a certain age. That is sufficient.

On the prejudice side of the scale, "[t]he prejudice which exclusion of evidence under [section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in [section 352] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [section 352], "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here, the cellphone evidence was highly probative of Viruncruz's lewd intent

and focus on pre-pubescent teen boys, and as tailored by the trial court it was not substantially outweighed by the minimal prejudicial effect.

As with section 1108, our review of section 1101(b) rulings is highly deferential, and we will not reverse unless it is shown the trial court ruled in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Parker, supra,* 13 Cal.5th at p. 39.) The trial court here held an extensive evidentiary hearing and afterwards carefully considered how best to strike the balance. It excluded some of the proffered evidence and "sanitized" other parts. Viruncruz has not shown the court abused its discretion in doing so. The cellphone evidence was therefore also admissible under section 1101(b).

Lastly, Viruncruz contends the admission of the cellphone evidence violated his federal constitutional right to due process and a fair trial. We are not persuaded.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) But because we have concluded that the cellphone evidence was properly admitted under two different sections of the Evidence Code, his constitutional claim fails. (See *People v. Valdez* (2012) 55 Cal.4th 82, 134.) When a defendant raises "only a new constitutional 'gloss' on claims [raised] below … '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory ….' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364.)

Furthermore, the trial court's ruling regarding the admissibility of evidence of defendant's prior interest in child pornography of a kind and type akin to S.M.'s age and gender, which depicted conduct similar to the offenses with which he was charged, did not render his trial fundamentally unfair. There were legitimate

24.

permissible inferences that could be drawn from the cellphone evidence under both sections 1108 and 1101(b) and its introduction did not deny Viruncruz due process.

## III.   The Prosecutor's Cross-Examination

Viruncruz next claims the prosecutor committed prejudicial misconduct when she asked him on cross-examination about the internet searches for criminal defense attorneys he made while he was in the back of Pollack's patrol car.  He argues "a prosecutor's comments on a defendant's exercise of right to counsel is prohibited, especially when the prosecution uses such commentary to imply a defendant's guilt or innocence[.]"  That is true, but it is not what happened in this case.

The prosecutor brought a pretrial motion to admit the web searches made while Viruncruz was in the patrol car.[10]  She clarified to the court: "The People are not seeking to get into any of the searches for an attorney.  Simply the searches that include things like Penal Code Section 288, how long can you go to jail for child abuse.  So any mention of an attorney or trying to hire a specific attorney, the People are not seeking to admit …."  The court ruled the prosecutor could not introduce any of the attorney searches, but the other searches were admissible as relevant evidence –"not unduly prejudicial"– of consciousness of guilt.

During Sanchez's trial testimony, he told the jury that several web searches were made on Viruncruz's cell phone during the time he was detained in Pollack's patrol car, including:  "Steps to take if you are accused of child molestation;" "Do child molesters last long in jail;" and "Penal Code Section 288."

Outside the jury's presence, the trial court noted for the record that it had held a sidebar conference with the attorneys regarding Sanchez's testimony.  The court said it became concerned when the prosecutor began to question Sanchez about web searches

---

[10] She argued they were admissible hearsay as party opponent admissions (§ 1220), and not as character evidence.  Their proffered relevance was to show Viruncruz's consciousness of guilt.

made in the patrol car because it had previously excluded reference to the searches Viruncruz had made for an attorney. The court also observed that although the prosecutor had not offered any evidence of the attorney searches, the *defense* was permitted to present evidence of those searches:

> "The Court: Those [attorney searches] have been excluded; however, based on the Defense argument as to the reasonableness of what he was doing at the time, the Defense at some point may want to get into the fact he searched for an attorney. They can do it through [Sanchez] or through any other evidence they might have to support that conclusion. I just wanted to make sure we didn't have a mix up here."

Defense counsel did not ask Sanchez about the attorney searches, but later, during Viruncruz's *direct examination*, defense counsel first brought up the subject:[11]

> "[Defense Counsel:] Okay. Did you — did you do some searches for attorneys at all?
>
> "[Viruncruz:] Yes, I did look for an attorney.
>
> "[Defense Counsel:] There was a mention that there was one search for a PC 288, do you know what that is?
>
> "[Viruncruz:] I don't know what that is."

Only then did the prosecutor cross-examine Viruncruz about his cell phone searches:

> "[Prosecutor:] [Y]ou looked up how much time a sex offender would get in jail, correct?
>
> "[Viruncruz:] No, I looked up attorneys for crimes. How do you say it for sexual crimes?
>
> "[Prosecutor:] You had your cell phone with you the whole time you were in the back of [Pollack's] car, correct?
>
> "[Viruncruz:] Yes.

---

[11] Viruncruz does not mention this in his briefs.

"[Prosecutor:] And it's your testimony today that you didn't look up anything to do with child molestation other than attorneys?

"[Viruncruz:] I looked up attorneys. And from there, other pages c[a]me up.

"[Prosecutor:] And you co[nn]ected on those other pages, didn't you?

"[Viruncruz:] The one that you said about child molestation, I don't know, but I did look up other pages of sex crimes."

"[Prosecutor:] Sir, if you can take a look [at an exhibit displaying the web searches]. Child molestation, how long for jail? How do you explain that search?

"[Viruncruz:] "I can't give you that explanation, because – I can't give you an explanation for that, because that's something that I can't tell you, because I don't remember having co[nn]ected on that."

Viruncruz continued to deny looking up how much time a sex offender would get in jail or anything to do with child molestation, saying "I only did a search for attorneys for sexual crimes." Later in her cross examination, the prosecutor again asked Viruncruz about the specific searches he made for attorneys:

"[Prosecutor]: [T]he second you saw [S.M. get out of Sorrow's car], you knew what this case was about, didn't you?

"[Viruncruz:] Because I recognized the young man when he got out of the patrol car.

"[Prosecutor:] And your searches that you conducted on your cell phone at that time weren't for robbery, they were for child molestation, correct?

"[Viruncruz:] Because I saw on social media that it said sexual assault.

"[Prosecutor:] So your reaction was to search your phone for child molestation, because you knew what you did two days before, isn't that true?

"[Viruncruz:] I looked up attorneys for sex crimes, but I never looked up sexual molestation."

The prosecutor then showed Viruncruz the exhibit depicting the web searches:

"[Prosecutor:] If you look [at the exhibit], you see Bakersfield, California lawyers, is that a search that you conducted on September 3rd, 2018?

"[Viruncruz:] Yes, I looked for attorneys.

"[Prosecutor:] Can you turn to the next page, please. On that page, do you find further searches for attorneys?

"[Viruncruz:] Yes, it says here criminal defense attorneys.

"[Prosecutor:] And those are searches that you made on September 3rd, 2018?

"[Viruncruz:] Related to attorneys, yes, yes."

On redirect, Viruncruz explained that when he was trying to search for attorneys, those other "things" just "pop[ped] up." But they were "things that [he] did not make a specific request for."

Defense counsel made no objections to the questions the prosecutor asked on cross-examination regarding the web searches Viruncruz said were his attempts to search for an attorney. But we need not consider whether the issue is thereby forfeited on appeal because the prosecutor committed no misconduct.

The trial court's pretrial ruling precluded the prosecutor from introducing the attorney searches in her case, which she did not do. It was defense counsel who introduced the evidence that Viruncruz searched for an attorney as an explanation for why Viruncruz made the other – rather incriminating – searches he made that day.

A defendant who chooses to testify is not immune from cross-examination, and the scope of permissible cross-examination is "very wide." (*People v. Harris* (1981) 28 Cal.3d 935, 953; see *People v. Farnam* (2002) 28 Cal.4th 107, 187 (*Farnam*) [trial court has "wide discretion in controlling the scope of relevant cross-examination"]; *People v. Lena* (2017) 8 Cal.App.5th 1145, 1149 [if the defendant testifies, the prosecutor may cross-examine him to test his credibility or otherwise refute his statements].) Thus, after the defendant testifies, the prosecutor " 'may fully amplify his testimony by

28.

inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 382.) Consequently, once that proverbial door was opened by the defense, the prosecutor was entitled to cross-examine Viruncruz about his explanation of how his searches for attorneys just happened to innocently "pop-up" some rather odd new search terms. (Cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 72 [defendant's testimony on direct examination "opened the door" to cross-examination on matters that would normally adversely affect defendant's right against self-incrimination]; cf. *Jenkins v. Anderson* (1980) 447 U.S. 231, 236, fn. 3 ["[A] defendant who speaks in his own defense cannot avoid testifying fully. [¶] '[A] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination.' "].) The federal circuit court cases Viruncruz cites in support of his contention are all factually distinguishable.[12]

---

**12** In *Hill v. Turpin* (11th Cir. 1998) 135 F.3d 1411, a Georgia death penalty case, the prosecution repeatedly "encouraged the jury to infer the falsity of [the defendant's] exculpatory story from his exercise of *Miranda* rights at the time of his arrest …." (*Id.* at p. 1418.) In *Bruno v. Rushen* (9th Cir. 1983) 721 F.2d 1193, the prosecutor's closing argument was "a vicious attack on the accused's claims of innocence by openly hinting to the jury that the fact that the accused hired counsel was in some way probative of the defendant's guilt." (*Id.* at p. 1194.) Moreover, "the obvious import of the prosecutor's comments was that *all* defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth in an abominable attempt to confuse the jury as to their client's involvement with the alleged crimes." (*Ibid.*) So too with Viruncruz's other cited cases: *United States v. McDonald* (5th Cir. 1980) 620 F.2d 559, 564 ["[T]he real purpose of [prosecutor's] reference to [an] attorney's presence [at the execution of a search warrant] was to cause the jury to infer that [the defendant] was guilty," and he "would not have gotten a lawyer unless he was guilty"]; *Zemina v. Solem* (8th Cir. 1978) 573 F.2d 1027, 1028 [prosecutor's closing argument that the defendant's phone call to his attorney after his arrest indicated guilt]; *United States ex rel. Macon v. Yeager* (3d Cir. 1973) 476 F.2d 613, 617 [prosecutor asked defendant on cross examination why he needed to call his lawyer the day after the murder when he had not yet been arrested]; *United States v. Daoud* (1st Cir. 1984) 741 F.2d 478, 480 [*Doyle* error applies to

Here the prosecutor did nothing remotely like the prosecutors in Viruncruz's cited cases. Instead, she merely attacked Viruncruz's credibility with the absurdity of his claims that all he did was use his phone to search the web for attorneys and he had no idea how those other things just "popped up." Moreover, also unlike the prosecutors in the cases cited or relied upon by Viruncruz, here the prosecutor did not make any kind of suggestion or imply that the jury should make anything of the fact Viruncruz claimed he was searching for attorneys when these other things appeared. Rather, she merely argued that Viruncruz's explanation was simply unbelievable.

Finally, the prosecutor's cross-examination was harmless under any standard. Since Viruncruz had already introduced evidence that he had searched for attorneys, the prosecutor's questions about that evidence did not tell the jurors anything they did not already know. There was no improper cross-examination.

## IV. The Prosecutor's Closing Arguments

Viruncruz next contends the prosecutor committed reversible misconduct in her closing arguments and, if the claim is forfeited, because defense counsel failed to object, he was constitutionally ineffective. We are not persuaded.

### A. Additional Factual Background

Viruncruz focuses on four excerpts from the prosecutor's closing arguments which he insists constitute prosecutorial misconduct. The first, from her opening remarks:

> "[The Prosecutor:] Ladies and gentlemen, what does child molestation look like? In this case, it looks like every parent's worst nightmare. You get a phone call that tells you that your child has been picked up by a stranger driven to an area where he doesn't know anyone. He doesn't recognize any area, anything in the area, and that individual who did that to him also sexually assaulted him.

---

invocation of right to an attorney]; *United States v. Pavelko* (3rd Cir. 1993) 992 F.2d 32, 34 [prosecution offered a financial affidavit the defendant filled out in order to obtain an attorney to use against him at trial].

"Your child had to fight to get out of that vehicle, sprint to another stranger's home and report to them in order to find a safe place. Every parent's worst nightmare is what this situation of child molestation looks like."

The second, from her rebuttal argument:

"Ladies and gentlemen, I told you that this situation of child molestation is every parent[']s worst nightmare. [S.M] met a monster on the first [of September, 2018]."

And the third, also from her rebuttal:

"[Viruncruz's] attempt up there on the [witness] stand was the last [ditch] effort to try and fool you into thinking that he is not the monster that he is. He preyed on an innocent victim, a stranger that he knew nothing about and he took advantage of the situation and thankfully [S.M.] had the guts and the nerve to fight back and to run away and tell[] them the truth."

Fourth, Viruncruz alleges it was misconduct for the prosecutor to characterize him as "a sick, evil man," who made "disgusting" web searches for child pornography.

As noted, defense counsel made no objection to any of these remarks.

**B. Analysis**

**i. Forfeiture**

" 'Improper comments by a prosecutor require reversal of a resulting conviction when those comments so infect a trial with unfairness that they create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 480 (*Winbush*).) "For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that ' "the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*Ibid.*) " 'In conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Covarrubias, supra,* 1 Cal.5th at p. 894.)

31.

Nevertheless, " '[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*Winbush, supra*, 2 Cal.5th at p. 481.) The People contend, and we agree, that Viruncruz forfeited his claim of prosecutorial misconduct by failing to make timely objections. There is nothing in the record to indicate that an objection would have been futile or that the prosecutor's argument was "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) The claim is therefore forfeited.

### ii. Ineffective Assistance of Counsel

Turning to Viruncruz's alternative "argument" that defense counsel's failure to object constituted ineffective assistance of counsel, we note at the outset that Viruncruz fails to discuss or develop any legal arguments or authorities in support of this claim; he simply summarily asserts it. His entire briefing is focused on the prosecutor's remarks, and he devotes nothing to how or why trial counsel was ineffective for failing to object, the standard of review, or how we as a reviewing court should even address his claim.

" '[E]very brief should contain a legal argument with citation of authorities on the points made.' " (*People v. Stanley* (1999) 10 Cal.4th 764, 793.) "If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as waived, and pass it without consideration." ' " (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at pp. 363–364; see Cal. Rules of Court, rule 8.883(a)(1)(A) [briefs must support "each point by argument and, if possible, by citation of authority"].) We thus deem his "alternative argument" waived. But even were we to address its merits, the claim still fails.

### a. Legal Background

"An ineffective assistance claim has two components: A [defendant] must *show* that counsel's performance was deficient, and that the deficiency prejudiced the defense."

(*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*), italics added; see *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Both components "are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073 (*Gay*).)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record *affirmatively discloses* counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*), italics added; see *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 ["deficient performance [must be] based upon the four corners of the record"].)

"When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did. … Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " (*Gay, supra*, 8 Cal.5th at p. 1073; *Harrington v. Richter* (2011) 562 U.S. 86, 105 ["standard for judging counsel's representation is a most deferential one"].)

Because deciding whether to object is inherently a tactical decision, the failure to do so will rarely establish ineffective assistance of counsel. (*Johnsen, supra,* 11 Cal.5th at p. 1165; *People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Similarly, because a defendant "must *demonstrate* that counsel's representation 'fell below an objective standard of reasonableness,' " as measured by " 'prevailing professional norms,' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added), "[r]arely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons

for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.) As a result, such considerations are normally more properly brought on habeas corpus. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

As to prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693.) Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely *in the context of the whole argument and instructions* that ' "the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*Winbush, supra,* 2 Cal.5th at p. 480, italics added.)

### b. Epithets

Viruncruz first complains the prosecutor committed misconduct when she called him a "sick, evil man," and a "monster" who made "disgusting" internet searches. The apparent implication is that it is reasonably likely in the context of both counsels' entire arguments, and the trial court's instructions, that the jury was so affected by these epithets that it was reasonably likely to have made a difference to the outcome.

Prosecutors are given wide latitude during argument. (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).) Summations may be vigorous; a prosecutor is " ' "not limited to 'Chesterfieldian politeness' " [citation] and [s]he may "use appropriate epithets." ' " (*Ibid.*) The mild and fleeting language the prosecutor used here does not rise to the level of misconduct. In *People v. Zambrano* (2007) 41 Cal.4th 1082, 1172, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, the prosecutor repeatedly called the defendant "especially evil," a liar, and a "dangerous sociopath" in closing argument. The court found no misconduct, noting that several more derogatory epithets have been found within the range of permissible argument. (*Ibid.*;

see, e.g., *People v. Friend* (2009) 47 Cal.4th 1, 84 (*Friend*) [defendant called an "insidious little bastard"]; *People v. Thomas* (1992) 2 Cal.4th 489, 537 (*Thomas*) [defendant called a "perverted murderous cancer" and a "walking depraved cancer"]; *People v. Sully* (1991) 53 Cal.3d 1195, 1249 [defendant was a "human monster" and "mutation"].) Similarly, in *Farnam*, *supra*, 28 Cal.4th at p. 168, the prosecutor's opening statement described defendant as "monstrous," "cold-blooded," and said that the evidence would be "horrifying" and "more horrifying than your worst nightmare." The court concluded this was fair comment on what the prosecutor expected the evidence would show. (*Ibid.*) Here it was similarly fair comment on what the prosecutor believed the evidence had shown.

Moreover, the jury was instructed that attorneys' remarks are not evidence but merely reflect counsel comments on the evidence. (CALCRIM No. 222.) We presume the jury followed the court's instructions. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) Indeed, that presumption is a crucial underpinning of our constitutional system of trial by jury. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Viruncruz has provided nothing to rebut that presumption and there is nothing in the record to indicate the jury failed to heed the court's admonishment in this case.

Considering the instructions and the evidence in this case, it is not reasonably probable that had defense counsel objected, there would have been a different result. As such, it was not unreasonable for defense counsel not to object because the meritless objection would have been properly overruled. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463; *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].) The prosecutor's descriptions of Viruncruz did not improperly inflame the jury. (See *Friend, supra*, 47 Cal.4th at p. 84.)

### c. "Every parent's worst nightmare"

Viruncruz next claims the prosecutor committed misconduct when she referred to the evidence of what Viruncruz did to S.M. as "every parent's worst nightmare," thereby

improperly urging the jurors to place themselves in the position of S.M.'s parents. Again, the apparent implication is that it is reasonably likely in the context of the whole argument and instructions that the jury was so affected by this argument that it probably made a difference to the outcome.

Except in the penalty phase of a capital trial, it is inappropriate for a prosecutor to appeal to sympathy by inviting the jury to view the case through the victim's eyes because an appeal for sympathy for the victim is out of place during an objective determination of guilt. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1406–1407; *People v. Fields* (1983) 35 Cal.3d 329, 361 [Prosecutor argued, "Now, think of yourself as" the murder victim, and then proceeded to describe the crime from the perspective of each juror in the role of the victim]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192, 1198 (*Vance*) ["Walk in [the victim's] shoes," and "relive … what [the victim] experienced;" labeling such improper arguments as "Golden Rule" arguments].)

Similarly, asking the jurors to put themselves in the position of a crime victim's *parent* is also improper. Thus, in *People v. Pensinger* (1991) 52 Cal.3d 1210 (*Pensinger*), the court found it improper for the prosecutor to say, "Suppose instead of being [murder victim's mother]'s kid this had happened to one of *your* children." (*Id.* at p. 1250, italics added; accord, *Vance, supra,* 188 Cal.App.4th at p. 1193.)

The People respond by drawing a distinction between "put yourself in the parents' shoes" and "every parent's worst nightmare," arguing the latter did not invite the jurors to imagine how S.M. or his parents actually felt or suffered, and therefore was not an appeal for sympathy. Although it is a close call, we agree.

Instead of asking jurors to consider how they would *feel*, the prosecutor was describing the nature of the crimes themselves, i.e., the evidence. Thus, she rhetorically asked, "[W]hat does child molestation *look like*? *In this case*, it looks like every parent's worst nightmare." (Italics added.) She then described what the evidence showed and concluded, "[e]very parent's worst nightmare is what *this situation* of child molestation

*looks like*." (Italics added.) Finally, in her rebuttal argument, she referred back to what she said earlier: "I told you that *this situation* of child molestation is every parent[']s worst nightmare." This comment can be fairly construed as summation and comment on the facts of the case, i.e., of the *situation*.

We are mindful that for a prosecutor's remarks to constitute misconduct, it must be reasonably likely the jury understood or applied the complained-of comments in an improper or erroneous manner. And " '[i]n conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Covarrubias, supra* 1 Cal.5th at p. 894.)

In *Farnam, supra*, 28 Cal.4th at p. 168, the prosecutor's opening statement used a description of the defendant as "more horrifying than *your worst nightmare*." (Italics added.) The court found this was fair comment on what the prosecutor expected the evidence would show. (*Ibid*.) Similarly, here the prosecutor was fairly commenting on what the evidence *did show*. Had she phrased her remarks as "your worst nightmare," it is unlikely it would have been even marginally questionable.

In any event, because we are reviewing prejudice in the context of an ineffective assistance of counsel claim, we need not draw a fine line between marginally improper Golden Rule comments and legitimate comments on the evidence because we find no likelihood it would have mattered had defense counsel objected to the prosecutor's relatively isolated use of the phrase in her otherwise extensive closing arguments.[13]

In *Pensinger, supra,* the prosecutor clearly erred by unabashedly asking the jurors to put themselves in the position of the crime victim's mother. Even so, the *Pensinger* court found no prejudice: "We see no reasonable probability that a result more favorable to defendant would have been reached if the court had admonished the jury. [Citation.] The prosecutor's comment was an isolated one and it was not repeated. The misconduct

_____

[13] The prosecutor's closing arguments comprise 60 pages of reporter's transcript.

37.

did not add cumulative impact to other errors in a crucial area of the case." (*Pensinger, supra,* 52 Cal.3d at p. 1250.) A similar result ensues here. Viruncruz has not shown the prosecutor's scant remarks " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)

Furthermore, S.M.'s parents *testified* in this case. The jury saw just what it was like to be S.M.'s parents, not to imagine it, and it is clear from their testimony that it was less than pleasant.[14] Both parents recounted their continuing distress by contrasting how their son's behavior had radically changed from before the incident to after, and thereby lending circumstantial support to S.M.'s credibility. Commenting on the testifying parents' personal nightmares was not an improper appeal to sympathy.

And again, the trial court admonished the jury that the attorneys' statements did not constitute evidence. (See CALCRIM No. 222.) There is nothing in the record to indicate the jury failed to heed the court's admonishment in this case.

In sum, there is no merit to Viruncruz's conclusory claim that his trial counsel was constitutionally ineffective for not objecting. Defense counsel's trial strategy here was three-fold: (1) Viruncruz did not do what S.M. accused him of; (2) Viruncruz was actually an innocent victim of a robbery who just did not know how all those child pornography links got on his phone; and (3) S.M. was someone who took money from a naïve innocent to help support his parents in their hard times. While objecting and "requesting an admonition was one tactical option, counsel could have also decided that objecting would focus the jury's attention" on the evidence "in ways that would not be helpful to the defense." (*People v. Harris* (2008) 43 Cal.4th 1269, 1290.) That question is better addressed on habeas corpus.

---

[14] For example, the court paused the proceedings twice during Father's testimony to allow him to compose himself.

As observed *ante*, "[a] mere failure to object to argument seldom establishes counsel's incompetence[.]" (*Thomas, supra,* 2 Cal.4th at p. 531.) And "this case is no exception." (*Ibid.*) In light of the trial court's cautionary instructions and Viruncruz's ability to fully challenge S.M. on cross-examination, we discern neither prejudice nor a denial of his right to a fair trial based solely on the questionable wording of a small portion of the prosecutor's final closing argument. In other words, it is not reasonably probable the result would have been different had trial counsel objected to the prosecutor's remarks. Viruncruz has failed to demonstrate ineffective assistance of counsel. The claim is not only waived, but it also fails on the merits.

## V. *"Dewberry*[15] **Error:" The Lesser Included Offense Jury Instructions**

Viruncruz next claims the trial court prejudicially erred by failing to give "adequate" jury instructions regarding how the jury should consider lesser included offenses. Again, we disagree.

### A. Additional Background

The trial court instructed the jury with CALCRIM No. 1203 for the aggravated kidnapping offense. In addition, jurors were instructed on the lesser included offenses of simple kidnapping (CALCRIM No. 1215), false imprisonment by violence (CALCRIM No. 1240), and simple false imprisonment (CALCRIM No. 1242).

The court also instructed the jury on how to consider lesser included offenses with CALCRIM No. 3519:

> "THE COURT: *If all of you find that the defendant is not guilty of a greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime.* A defendant may not be convicted of both a greater and lesser crime for the same conduct. [¶] Now I will explain to you the crimes affected by this instruction including lesser crimes of the lesser crimes:

---

[15] *People v. Dewberry* (1959) 51 Cal.2d 548 (*Dewberry*).

"1.      Kidnapping (P.C. §207(A)) is a lesser crime to kidnapping for the purpose of committing a lewd or lascivious act … ;

"2.      False Imprisonment by violence or menace (P.C. §237(a)) is a lesser crime to the lesser crime of kidnapping … ;

"3.      False imprisonment (P.C. §237(a)) is [a] lesser crime to the lesser crime of false imprisonment by violence or menace … ;  [¶] … [¶] … [¶] … [¶]

"1.      If all of you agree the People have *proved* that the defendant is guilty of the greater crime, complete and sign the verdict form for guilty of that crime. Do not complete or sign any verdict form for the lesser crime.

"2.      If all of you cannot agree whether the People have *proved* that the defendant is guilty of the greater crime, inform me of your disagreement and do not complete or sign any verdict form for that crime or the lesser crime.

"3.      If all of you agree the People have not *proved* that the defendant is guilty of the greater crime and also agree the People have proved that he is guilty of the lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for guilty of the lesser crime. Do not complete or sign any other verdict forms for those charges.

"4.      If all of you agree the People have not *proved* that the defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for not guilty of the lesser crime.

"5.      If all of you agree the People have not *proved* that the defendant is guilty of the greater crime, but all of you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty of the greater crime and inform me about your disagreement on the lesser crime.

"*Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.*"  (Italics added.)

Viruncruz does not contest the correctness or applicability of the lesser offense instruction as given; rather, he questions its sufficiency.  He insists the court had a sua sponte duty to give an *additional* instruction, which he does not identify or provide,

specifically telling the jury to apply the reasonable doubt standard when assessing lesser versus greater offenses, citing *Dewberry, supra,* 51 Cal.2d 548 in support.[16]

## B. Standard of Review and Legal Background

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) But "instructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Ca1.4th 619, 677.) And even "[i]f the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Ca1.App.3d 1254, 1258.)

*Dewberry* instructional error requires reversal only if it is reasonably probable that in the absence of the error, the result would have been more favorable to the defendant. (*Dewberry, supra*, 51 Cal.2d at p. 558; *People v. Crone* (1997) 54 Cal.App.4th 71, 78 (*Crone*); *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## C. Analysis

In *Dewberry, supra*, 51 Cal.2d at page 554, the defendant requested the trial court to instruct the jury that if it had a reasonable doubt whether defendant was guilty of

---

[16] This argument could be summarily rejected because it blurs the distinction between an instruction regarding a general principle of law, which must be given sua sponte, and a pinpoint instruction that must be requested by the defense. Here, of course, there was no such request. Even so, to the extent Viruncruz argues the trial court erred in a way that affected his substantial rights, we treat this claim as not forfeited and will consider it. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1000; see Pen. Code, § 1259.)

murder or manslaughter, it could convict him only of manslaughter. Our Supreme Court reversed the defendant's conviction because the trial court had rejected the request, even though it had given a similar instruction with regard to the *degrees* of murder. (*Id.* at p. 557.) The court explained that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense." (*Id.* at p. 555.)

Many years later, our Supreme Court reiterated *Dewberry*'s holding, and stated "that a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to *all* crimes with lesser degrees or related or included offenses." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262 (*Musselwhite*), original italics.) The court held that a jury is adequately instructed as to the *Dewberry* principle if the trial court gives the "several generally applicable instructions governing [the] use of the reasonable doubt standard," which will have the "effect" of requiring the jury to give the defendant the benefit of any reasonable doubt as to any lesser included or related offenses or lesser degrees. (*Id.* at pp. 1262, 1263.) Thus, so long as the trial court gives the other relevant standard instructions, those instructions together will ensure the jury understands the reasonable doubt principle as applied to the choice between greater and lesser offenses, and there is no need to give a special instruction expressly applying the *Dewberry* principle. (*Friend, supra,* 47 Cal.4th at pp. 55–56; see *Musselwhite, supra*, 17 Cal.4th at p. 1263.)

Although Viruncruz quotes the trial court's admonishment in his brief, he neglects to mention it was CALCRIM No. 3519, nor does he discuss why this standard instruction was inadequate.[17] Instead of addressing the instructions that *were* given, Viruncruz

---

[17] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).) The CALCRIMs are such instructions. (*People v. Lucas* (2014) 60 Cal.4th 153, 294, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

cursorily asserts that the trial court prejudicially erred by not giving a pinpoint instruction on the *Dewberry* principle. He provides no authority to suggest CALCRIM No. 3519 does not satisfy *Dewberry*, nor have we found any.

Similarly, Viruncruz does not discuss CALJIC 17.10,[18] the predecessor to CALCRIM No. 3519, which several courts have approved in cases like the one before us. (See *Crone, supra,* 54 Cal.App.4th at p. 76 ["When the defendant is charged with a greater offense which has one or more *uncharged* lesser included offenses, the trial court ordinarily will give CALJIC No. 17.10, *which satisfies the requirement of Dewberry.*" (Second italics added.)]; *People v. Gonzalez* (1983) 141 Cal.App.3d 786, 793, disapproved on other grounds in *People v. Kurtzman* (1988) 46 Cal.3d 322, 330 [CALJIC 17.10 was "tailor-made to express the *Dewberry* concept"]; *People v. St. Germain* (1982) 138 Cal.App.3d 507, 521 ["In giving CALJIC No. 17.10, the trial judge adhered precisely to *Dewberry*"].)[19]

Absent a contrary showing in the record, an appellate court assumes the jurors were able to understand, correlate, and follow the court's instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) Moreover, a reasonable juror would have understood CALCRIM No. 3519 and applied

---

[18] CALJIC 17.10 provides in part: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict [him] [her] of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime. [¶] . . . [¶] . . . [¶] . . . [¶] Thus, you are to determine whether [a] [the] defendant[s] [is] [are] guilty or not guilty of the crime[s] charged [in Count[s] ] or of any lesser crime[s]. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict[s]. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the [charged] [greater] crime."

[19] Viruncruz not only does not tell us what a "proper" *Dewberry* instruction would have been, but he fails to cite a case where such an instruction was given.

43.

the court's other instructions "as governing how to return the verdicts and findings after completing deliberations." (*People v. Dennis* (1998) 17 Cal.4th 468, 537.)

Jury instructions require no talismanic form. (See *People v. Fiu* (2008) 165 Cal.App.4th 360, 370.) The *Dewberry* principle need not be addressed in a single jury instruction that explicitly connects the reasonable doubt standard to the choice between greater and lesser offenses, and Viruncruz provides no contrary authority. *Dewberry* is satisfied when the instructions as a whole advise the jury to give the defendant the benefit of any reasonable doubt they may have with respect to all crimes with lesser included offenses. (*Friend, supra,* 47 Cal.4th at pp. 54–56; *Musselwhite, supra*, 17 Cal.4th at p. 1262.)

As a result, we review the entirety of the jury instructions to ascertain whether the jury was properly advised of the principles expressed in *Dewberry*; in short, that the prosecution must always prove guilt beyond a reasonable doubt. (*Dewberry, supra,* 51 Cal.2d at p. 556.) *Dewberry* is met when the jury is instructed that if it finds the prosecution has not proven the elements of the greater offense beyond a reasonable doubt, then the defendant can be found guilty of the lesser offense if that offense has been proven beyond a reasonable doubt. (See *People v. Barajas* (2004) 120 Cal.App.4th 787, 794.) And CALCRIM No. 3519 does exactly that.[20]

---

[20] In addition to CALCRIM No. 3519, the trial court also instructed with CALCRIM No. 220, which addressed the core principles of the presumption of innocence and the People's burden of proving guilt beyond a reasonable doubt, including: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." The court also gave several instructions reinforcing the principle that the reasonable doubt requirement applied no matter what type of evidence was presented against Viruncruz. For example, CALCRIM No. 224 instructed that a fact could be established with circumstantial evidence only if that fact was established beyond a reasonable doubt, and that "[i]f you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." Similarly, CALCRIM No. 359, addressing the corpus delicti rule, also repeated the admonition that Viruncruz could not be convicted of "a crime *or a lesser included offense* … unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

We therefore reject Viruncruz's claim that the jury was not given adequate instructions to explain the effect of reasonable doubt on the choice between the greater and lesser offenses. Viewed as a whole, the combined CALCRIM instructions did not leave any misleading impressions, nor did they restrict the jury's ability to consider the lesser offenses. They provided the jury with sufficient information to comply with *Dewberry*. (See *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1138 [A trial court has no duty to give repetitious instructions].) There was no instructional error.

Even assuming *Dewberry* error occurred, the error was harmless in this case. Under the *Watson* standard, it is Viruncruz's burden to demonstrate the reasonable probability of a different result. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.) However, despite having the burden to demonstrate prejudice, Viruncruz does not set forth any facts or legal authority to support his claim and instead again merely asserts that a more precise instruction was required. Here, it is not reasonably probable Viruncruz would have received more favorable verdicts had the jury received a superfluous pinpoint *Dewberry* instruction.

This was a credibility contest: the jury either believed S.M's account or Viruncruz's. There was no grey area in between where a lesser included offense to aggravated kidnapping would fit the facts. A redundant pinpoint *Dewberry* instruction would not have changed the outcome. (*Crone, supra,* 54 Cal.App.4th at p. 78; *Dewberry, supra,* 51 Cal.2d at p. 558.)[21]

## VI.    Cumulative Error

Viruncruz next contends that a combination of errors rendered his trial fundamentally unfair, requiring reversal. It is true "a series of trial errors, though

---

[21] This may have been a one-on-one credibility contest in theory, but this was not a lengthy deliberation indicating a close case. The jury retired for deliberations at 3:11 p.m. and went home at 4:06 p.m. They resumed deliberations the next morning at 9:36 a.m., and at 11:40 a.m. sent out their only note, informing the trial court, "We have a verdict on all counts." They expressed no need for read-back of testimony or any clarification of the jury instructions.

independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Hill, supra,* 17 Cal.4th at p. 844.) Here, although we found that a few of the statements made in the prosecutor's closing arguments were suspect, the claim was forfeited, and they were not prejudicial in any event. Simply put, there were no errors to cumulate.

## VII. Remand for Resentencing After Senate Bill No. 81

Lastly, Viruncruz claims his sentence must be reversed and remanded for resentencing because of recent statutory changes engendered by Senate Bill No. 81's (hereafter SB 81) amendments to Penal Code section 1385 when they became effective on January 1, 2022. Not so.

The parties disagree as to whether SB 81 even applies to Viruncruz's case. Viruncruz argues it does under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). The People respond that newly amended Penal Code section 1385, subdivision (c) expressly applies only to those who are sentenced after January 1, 2022, and Viruncruz was sentenced in June 2020. We need not resolve the retroactivity question, however, because amended Penal Code section 1385 does not apply to Viruncruz for a more fundamental reason.[22]

SB 81 "became effective on January 1, 2022," and amended Penal Code section 1385 "to specify factors that the trial court must consider when deciding whether

---

[22] Even so, we do note that *Estrada, supra,* is limited to those statutory amendments in which the Legislature has been *silent* on retroactivity, or as the court put it, there is no "saving clause." (*Id.*, 63 Cal.2d at pp. 747–748 ["[W]here the amendatory statute mitigates punishment and there is *no saving clause*, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (Italics added.)].) Conversely, when the amended statute contains "an express statement (a saving clause) by the Legislature *as to when the amendment applies* . . . the rule of *Estrada does not apply.*" (*People v. Cruz* (2012) 207 Cal.App.4th 664, 672, italics added.) SB 81 has a "saving clause," and it excludes Viruncruz's case. (See *People v. Flowers* (2022) 81 Cal.App.5th 680, 686, petn. for rev. pending, petn. filed Sept. 1, 2022, S276237 [SB 81 inapplicable to a sentencing hearing held on May 12, 2021].)

to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674; see Stats. 2021, ch. 721, § 1 (2021-2022 Leg. Sess.).).)

Amended Penal Code section 1385, subdivision (c) now provides in pertinent part that: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, *except if dismissal of that enhancement is prohibited by any initiative statute*…. This subdivision shall apply to all sentencings occurring after January 1, 2022." (Italics added.)

One such initiative statute, enacted by the voters in 2006 with Proposition 83, does in fact prohibit dismissal of the enhancements in this matter. Thus, Penal Code section 667.61, subdivision (g) states: "*Notwithstanding Section 1385 …, the court shall not strike any allegation, admission or finding of any of the circumstances specified in* [Penal Code section 667.61] subdivision (d) or (e) …." (Italics added; see Prop. 83, § 12, approved Nov. 7, 2006.)[23]

Here, on the forcible child molest charge, the jury found two enhancing allegations true: (1) Viruncruz kidnapped S.M. (Pen. Code, § 667.61, subd. (e)(1)); and (2) he substantially increased the risk of harm to S.M. while doing so (Pen. Code, § 667.61, subd. (d)(2)). Thus, even if the matter were being remanded for other reasons, the trial court would still lack statutory authority under new Penal Code section 1385 to dismiss Viruncruz's remaining Penal Code section 667.61 enhancement.

Penal Code section 667.61's sentencing scheme is plainly mandatory where, as here, the requisite circumstances were properly pled and proven. (See Pen. Code,

---

[23] In fact, in its analysis of SB 81, the Senate Committee on Public Safety was aware that "enhancements that may not be dismissed by the court due to express language provided by the initiative include those enacted by Proposition 83, pertaining to sex offenses, ... passed in 2006 …." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 81 (2021-2022 Reg. Sess.), p. 6.) In other words, Penal Code section 667.61 enhancements.

§ 667.61, subds. (b), (o).)  For us to hold that a trial court should now be entitled under new Penal Code section 1385 to refuse to impose a mandatory sentence – based on duly proven sentencing allegations that the Legislature and the voters have expressly prohibited it from dismissing – would nullify Penal Code section 667.61, subdivision (g)'s prohibition, and render Penal Code section 1385 superfluous.  We do not consider such an interpretation to be consistent with the Legislature's clear intent in passing SB 81 or that of the voters who approved Proposition 83.

## DISPOSITION

The judgment is affirmed.


                                                                SNAUFFER, J.
WE CONCUR:


PEÑA, ACTING P. J.


MEEHAN, J.